■ In the Matter of LILLIAN F. LYON. ELSIE O. HANSON, Respondent; JOHN R. LYON, Appellant.—In a proceeding pursuant to article 77 of the Mental Hygiene Law for the appointment of a conservator, the appeal is from a judgment of the Supreme Court, Westchester County, dated July 15, 1975, which, *inter alia,* appointed a conservator, except from so much thereof as (1) adjudged that there is a necessity for such an appointment and (2) adjudged that the duration of the conservatorship should be for an indefinite period. Judgment affirmed insofar as appealed from, without costs or disbursements. Appellant's principal grievance is that petitioner (as a "friend" of the conservatee), rather than he, the son of the conservatee, was appointed conservator. Appellant's mother, Mrs. Lyon, is 84 years old and resides in a nursing home. She is quadriplegic and in a pitiful medical

condition, and is virtually helpless. The evidence is undisputed that she is a woman of means and that the care she is receiving in the nursing home is first class care, as is the private nursing therein. Appellant is the remainderman of a trust which provides income for the support of his mother, which trust may be invaded to provide for her medical expenses if her other funds are inadequate. Although appellant is willing to waive compensation and to condition his appointment on his being precluded from changing his mother's medical care without prior court approval, it is clear that he considers her present care to be "squandering" in view of her condition. However, the opinion of Dr. Silberstein, Mrs. Lyon's personal physician, was to the effect that this care has been life-saving, and that without it, Mrs. Lyon "would succumb very quickly". Dr. Silberstein's opinion is fully supported by the evidence. Further, despite appellant's contention that his mother was hostile to his wife and that he did not often communicate with her because of her deteriorated mental condition, there is strong evidence that he was actually grossly indifferent to his mother. Thus, Harold Kelly, caretaker of Mrs. Lyon's Port Chester residence, and Mrs. Lyon's chauffeur for 10 or 11 years, testified that, before she went into the nursing home, she gave him instructions concerning appellant as follows: "Q. What were her instructions? A. She would not allow him in the house. She did not want him on the property. She said that if he came on the property I should call the police and have him removed. She said that he should definitely not be on the property." Mr. Kelly took Mrs. Lyon for rides when she was ill, and took her for rides after she went into the nursing home. On one occasion prior to her entering the nursing home, "she told me she bought him three boats and he sold the boats, and things like that. She told me she bought him three $50,000 yachts, and he sold them, and she never got the money back." Mr. Kelly also testified that: "Q. During the 10 years you have known Mrs. Lyon did you ever see her son visit her? A. No. Q. Did she ever tell you that her son had visited her? A. No." Nurse Goldie Solomon, who had been attending Mrs. Lyon for five years, testified that Mrs. Lyon spoke to her after the two times that appellant and his wife visited Mrs. Lyon: "All she would say was, 'Why are they here? What do they want? Why did she come?' It was very short and very clipped." Nurse Solomon further testified that appellant never called to discuss his mother's condition with her; never asked whether there was anything he could do to help his mother; never offered to take, and in fact did not take her for a ride, even though: "Q. Do you know where John R. Lyon lives? A. I certainly do, because we used to ride past the house on Weaver Street, and Mrs. Lyon showed it to me. It is less than a mile away from the nursing home. Q. It is on the same street? A. Yes, down the road." Nurse Solomon also testified that appellant never sent Mrs. Lyon a Mother's Day card, or a Christmas gift, or flowers, or get-well cards during her crises; he never did anything for her, and altogether visited her only twice—the two visits within a month, a year before the hearing. Appellant John R. Lyon testified that he is 55 years of age, married, retired, and was originally a yacht broker and marine insurance broker, and then a real estate broker. He had a "great relationship" with his mother until he was about 20 years of age; it was not too close after that. In contrast to appellant's considerable business experience but poor relationship with his mother, petitioner Hanson has had extremely limited business experience, but a better relationship with Mrs. Lyon. Thus, petitioner Hanson testified that she first had something to do with Mrs. Lyon's affairs when she (Hanson) was Alvin Ruskin's secretary and he was Mrs. Lyon's attorney. Mrs. Lyon "seemed very friendly towards me" and

brought petitioner gifts on each office visit until petitioner "put my foot down". When Ruskin became a Family Court Judge in 1970 and closed his law firm, petitioner continued as his secretary in the Family Court until he became a Supreme Court Judge in 1974. Petitioner is now personal secretary to another Family Court Judge. Petitioner has been taking care of Mrs. Lyon's affairs since Judge Ruskin became a Family Court Judge, and has thus been paying Mrs. Lyon's bills, keeping in touch with nurses, etc. Petitioner has had a power of attorney with respect to Mrs. Lyon's checking account. This was given to petitioner by Mrs. Lyon when Mrs. Lyon's mind "was clear" and Judge Ruskin became a Family Court Judge. Under all of the circumstances of this case, petitioner (and not appellant or an institution) was the best choice for conservator. Thus, with respect to the appointment of the conservator, Special Term's discretion was properly exercised (see *Matter of West,* 13 AD2d 599). In view of the extent of Mrs. Lyon's estate, and the nature of the services rendered by petitioner's attorney and by the guardian ad litem, we see no reason to disturb the allowances granted them by Special Term. Latham, Acting P. J., Damiani, Christ and Titone, JJ., concur; Shapiro, J., dissents in part and votes to modify the judgment by naming appellant as conservator, with appropriate limitations, as set forth in the following memorandum: The respondent, a married lady of 61 years of age, who has never managed real property and has never bought or sold stocks or invested in certificates of deposit for her own account, has a full-time position as a personal secretary to a Family Court Judge. She is not related to the incompetent and has not seen her in "a long, long time", probably more than two years. Altogether she has been to the nursing home where the incompetent is confined about three times. Under such circumstances, to make her the conservator of an estate having a market value of over $700,000, in preference to the incompetent's son, seems to me to be a gross abuse of discretion and simply a means of giving her an unjustified patronage plum at the expense of the estate. While the son is not depicted as a model of what a son should be, he is the sole beneficiary of the estate and has stipulated not to change his mother's medical care or place of confinement without prior approval by the court (see Mental Hygiene Law, § 77.19), and to waive any compensation for his services. With those appropriate limitations, he should be appointed as conservator in place of the respondent.